And let's take up the next case, Multicare Specialists v. Poole. Argument for the appellants. May I please report, counsel? My name is Lanny Darr, and I represent Joseph Poole and AAA Insurance Company. We're here today because of two basic reasons. One is that the trial court's order was so vague and did not specify under what legal theory the defendants were found to be liable. Second, we don't believe there was any legal or evidentiary basis to sustain the verdict against the defendants for breach of contract or for conversion. To give you a little background, Joseph Poole was a longstanding patient of Multicare, and so was his family. They had UnitedHealthcare insurance. Every time they went to the doctor, they would give them a UnitedHealthcare card. They would sign certain forms, assignment of benefits. And then at the conclusion, they would pay their co-pay for that service. When Mr. Poole got injured in an automobile accident, he went to the doctor of Multicare, gave him his card, paid his co-pay, and they submitted charges to his health insurer. And they were reimbursed for those submissions. Subsequently, Multicare decided that they had a policy that when there was a tort claim, they would not submit the charges to the health insurance, and rather they would sit back, attempt to assert a lien, and get paid at the end of the lawsuit. And in that manner, what they did essentially was avoid the HMO discount. In this particular case, there was a provider agreement also that provided that the health care professional could only charge its patients for co-pays and deductibles. And that was it. The trial court found, looking on page 2, it was never shown that Poole's employer or his group carrier was linked to the provider's PPOs, so there was no contract or relationship on which to base a claim that balance billing was prohibited. It seems like the trial court is saying there's a failure of proof on your side of the case as far as showing that Poole was linked to the PPO. Well, we believe that statement is contrary to the evidence produced at trial. What was produced at trial was the provider agreement, which they produced, which their people testified to was the sole basis for the reimbursement. And second of all, the evidence was that, in fact, they did submit its charges, and they were reimbursed for the first round. It was only after about a month or so later they quit submitting the charges and quit receiving payment. And why did that happen? Because they had an internal policy that said when you have an automobile accident or you have a tort claim, we're not going to submit it to the health insurer. That was undisputed. That was their internal policy, and they acted unilaterally on that policy to not submit Mr. Poole's charges to his health insurer. Now, I believe the Illinois law is settled in this regard, or I think the great weight of the law in Illinois, of course, too, is that when you submit, when a care provider submits its charges to a health insurer and that health insurer reimburses in accordance with the contract, that reduces the lien to zero. In this case, we have a different situation, which is they refuse to submit it. And it's our opinion that their allegation was essentially that there was a breach of a contract, that there was an implied contract for us to pay out of the settlement proceeds. Unfortunately, that was never established. There was, you know, as you know, to have a contract, you have to have defined sufficient terms so we know what happens if there's a breach of that contract. Well, here are the past practices that always been with the Poole family, that they submit their charges, or that they give them their health insurance card, UnitedHealthcare, they pay the copay or deductible, and that's all their obligation is. So the question becomes, what happens when they refuse to submit the charges? And in this case, it meant that Mr. Poole was damaged in the amount of $14,990. The owner of MultiCare testified to his deposition. Had they submitted his charges, he would only owe the copays, and that would be it. So, like I said, there was no – there could be no proving that there was an established contract, implied or written or verbal, for that matter, for Poole to pay out of his personal injury suit. And it makes credibility to suggest otherwise, because it makes no sense why a man would choose to forego his $25 copay in exchange for paying $15,000 on his personal injury settlement. Moreover, this implied contract that was alleged to exist does not tell us what happens in the event of a party losing their personal injury suit. They always maintained that there was no real harm to Poole because he was legally covered in his personal injury suit, and he would be paid out of that as opposed to his personal assets, as if that settlement was not a personal asset of Mr. Poole's. But under the plaintiff's theory, they never explained, well, what would happen to the plaintiff who tries his case and loses? And he's now passed the submission part, too, because all of these health insurance contracts have a window when you can submit the claims, and after the window period, they're barred. So if Mr. Poole had lost his claim, lost his lawsuit, he would still have to pay the $15,000, but there would be no lawsuit proceeds to pay it from. So we think that there was never sufficient or adequate terms proven to establish that there was a breach of contract or that any contract ever existed. I encourage this court to adopt the reasoning that there hasn't been a tortious interference case theory addressed, as I have been told by an appellate court in Illinois. But as we cited in our brief, there's a Wisconsin case that held that when a care provider fails to submit the charges to the patient's health insurer, they've engaged in a tortious interference with that insurance contract. And that's what we would urge the court to find today, that if you represent two of your patients that you accept UnitedHealthcare or any third-party payer benefits, you may not unilaterally ignore the terms of that contract, which provides, the provider contract provides that they must submit and only charge co-pays and deductibles. Moreover, they can't tell their client that they accept UnitedHealthcare and then sit back and at the end of the case decide they're going to get paid $15,000 out of a personal injury settlement, when really what they're entitled to is $25 plus the reimbursement. The other matter in this case was, like I said, the trial court never specified whether he found there was a breach of contract or that they engaged in conversion. For the reason I discussed previously, there could not be a breach of contract claim against Poole. There was no claim that there was a breach of contract by AAA Insurance. So then there has to be a certain assumption that the court made some finding that there was a conversion that took place. Well, Poole cannot have converted funds that he didn't know there was a claim for. The undisputed evidence in this case was that after they elected not to turn in their funds or submit the charges to UnitedHealthcare, they never sent Poole a statement showing he had an account balance. And they never sent his attorney a statement showing there was an account balance until after the conclusion of the case. They never asserted a lien. They never mailed a lien to Mr. Poole.  They mailed a lien to UnitedHealth – I mean to AAA Insurance, but they never put an amount on that lien, so it was never known. In the end, what happened was they thought they were paying off – those at UnitedHealthcare would lien on the file, so they paid that off assuming that they had satisfied all of the charges. But in this case, there can be no conversion because Poole never had a lien served on him. In the absence of that lien, he cannot have committed conversion because he had no knowledge of the claim. And if he has no liability under the theory of conversion, AAA can have no liability either because their liability is vicarious from Poole's. Do you concede that Poole's attorney had actual knowledge of the lien? No. Not until later on. As you know, I didn't represent Poole. Before – I'm talking about before the settlement was dispersed, did he have actual knowledge that there was a claim? I don't know. I think that was a disputed issue. Like I said, I wasn't involved in that aspect of the case. But his attorney was not party to the litigation. And like I said – His attorney is his agent, though, right? He would be his agent, yes. But once again, the claim was against Poole, and there's a specific knowledge and intent requirement against Poole. And Poole did not have that knowledge. And everybody agrees there was no lien sent to his attorney or to Poole. And the court seemed to have pulled in Richmond v. Caban that Illinois law does not require the court or a care provider to submit the charges first to the health insurer before looking for payment from the employer. And I think that Richmond case is confined to its own facts. And, in fact, presently, Richmond could not stand because that involved a hospital. We have an HMO Act in Illinois that specifically provides that a hospital cannot charge its patients any more than co-pays and deductibles when there's covered services. So if a hospital can't do it, there's no logical reason why another care provider should not be able – should be able to do the same thing that's prohibited by a hospital and prohibited by their agreement with the UnitedHealthcare, which says all you can do is charge our patients co-pays and deductibles. If you assert a lien for the full amount of your services without submitting those charges for reimbursement, you're charging your patient more than co-pays. So in this case, Mr. Poole's liability would have been for $25 as opposed to $15,000. And based on the fact that the court also found that we failed to prove a stopper, and in this case, I think the overwhelming evidence – and that court's finding would be – is the manifest way of the evidence, in that the unequivocal evidence was that for years, Poole had been billing two UnitedHealth – I mean, two multi-care hospitals. Two multi-care to get his health care. On each occasion, he paid the $25 co-pay and went about his business. There was no evidence in the record that Poole agreed not to have his charges submitted or that he was told that since he had a court claim, his charges would not be submitted. You have to understand that had this just been a routine health care unrelated to a lawsuit or accident, the charges would have been submitted. The only difference was now that they had a lawsuit which you would have to lean to. But in this instance, Poole acted in good faith. He came, he paid his co-pays, he went about the business he always does, and we think that that should have stopped the care provider from charging anything more than the co-pays on which they get contracted for. If this – if they were going to change the policy on Poole, they had to make him aware of it in some manner. In this case, it wasn't Poole who decided not to submit his charges. It was just the people who had a policy within the office which said when there's an injury claim, we don't submit it to health insurance. We try and get it back from the patient's settlement. So, in fact, we think there was a stop. It should have been enforced against a multi-court. And last, just getting back to the conversion issue, AAA – the record was that AAA had been told that all the liens would be taken care of. And because that's what they believed they were doing, because they had a UnitedHealthcare lien hanging out there that they had to pay. And some of that included charges from multi-care. So, clearly AAA could not have acted in bad faith or anything along those lines. But once again, we're making an assumption that that was the theory in which Judge Chapman held reliable, but because he never specifies in his order what was the basis. Last, we think it was error for the trial court to grant summary judgment on our counterclaim of violation of the Illinois Consumer Fraud Act. As you'll recall, we counterclaimed claiming that they concocted this scheme to maximize the recovery in instances only when there was a court recovery in the offing. And as such, that that was a violation of the Illinois Consumer Fraud Act because it was deceptive. They came in, they had signed the UnitedHealthcare information, took his card, took his copay, and then did not submit the charges onto his health insurer. And we felt that was false and fraudulent and a violation of the Illinois Consumer Fraud Act. The trial court just granted summary judgment to the plaintiff without prejudice. It was a summary judgment without prejudice in the event the pool was able to establish damages at a later date. If he could establish damages from this scheme, then under the theory of the law or under the order, he would be able to pursue a counterclaim. Well, in this case, we know that he had a judgment in it against him for $9,000 plus, and that constitutes damages. So based on that, we believe that that summary judgment order needs to be vacated and allow the counterclaim to proceed. Did you appeal that issue? We appealed it when it – with our notice of appeal, we believe that the summary judgment order, since it was without prejudice, could not become final until the judgment was entered. It was under the theory that we – but there was not a separate notice of appeal filed back then that was dismissed. Well, I mean, under the notice of appeal that you filed in this case that's on appeal now, did you indicate that you were appealing the court's summary judgment order? I think you did not. That's what I think. Okay. I mean, that issue was raised by a portion of counsel about whether there's jurisdiction for us to hear that issue since that was not – but you – if you look at the notice of appeal, it's not there. Right. Do you have anything you want to say about that? No, other than it's without prejudice, and I assume we could revisit that at the trial court level. That's all I have on this. All right. Thank you, counsel. Mr. Antonali. Thank you. Good morning, Your Honor. May it please the Court. Mr. Garr. David Antonioli, representing the Plaintiff Multicare Specialist, SC. I'd like to begin by addressing Justice Stewart's question about the trial court's finding regarding contracts. And the trial court did, in fact, find that there was no contractual relationship between Multicare, the plaintiff on one hand, and Mr. Poole's health care plan on the other. And that evidence is undisputed in the record. Multicare's witnesses said there was no contract between Multicare and UnitedHealthcare, who is Poole's employer's health care plan. What there was evidence of was a second contract, a so-called PPO contract, between one of these benefit administrator companies and an individual physician who worked with Multicare. The trial court found, as was proper under law, that that contract had absolutely no application in this case for at least three distinct independent reasons. First of all, and foremost, the plaintiff was not a party to that contract. The plaintiff, Multicare, is suing the defendants, not one of these individual physicians who happens to work for Multicare. Second, even if we assume that Multicare were bound by that contract, which it is not, then the patient would have to show that he had claimed the benefit of this contract. And, of course, the patient is not a party to the contract, and there is a clause in this agreement that says there is no third-party benefit protection for patients. So a patient could not raise any claim under this contract, even if Multicare were bound by it. But third, and perhaps most important, this PPH contract has three conditions in it that the patient cannot meet, even if he could claim the benefit of the contract, Your Honors. First of all, there are some definitions in this PPH contract. It only applies if the patient is a, quote, covered individual. The contract defines covered individual as someone who has a health care plan through his employer or otherwise that has a contract with Multicare, or the provider, pursuant to which that health care plan steers patients to Multicare. So we fail there because there is no underlying contract between Multicare and UnitedHealthcare that would trigger the operation of this so-called preferred provider agreement. Second, the preferred provider agreement only applies to, quote, covered care, another defined term in the agreement. And covered care says we will apply this contract to the extent and only to the extent that the services the health care provider is offering are services that are covered under an underlying contract between the patient and the patient's health care insurer. And as I said at the outset, there was no contract between Multicare and the patient's health care plan. Well, if all that's true, then why is it that on his first visits they were submitted to UnitedHealthcare and UnitedHealthcare discounted the bills and Multicare accepted the payment? There's two reasons, Your Honor. First of all, and this goes to Justice Schwarm's question to opposing counsel, why did we start billing UnitedHealthcare and stop? The evidence shows that early on in this patient's treatment, a balance developed. As a result of this balance, Multicare's billing service called the patient and says, this is not being paid by your health insurance carrier. How do you want to handle it? And the evidence was that the patient directed her to bill and collect from AAA, who the patient claimed was responsible for the accident. And I know you referenced that in your brief. And I and Mr. Dar will have the chance to address that on rebuttal. But I don't know if that is if that fact is an issue or or not. It is a disputed fact, and the trial court found in favor of Multicare. The trial court heard the witnesses, considered the evidence, was on the spot, occupied the best position to judge this credibility issue, and found in favor of Multicare. Under the applicable standard of review, manifest weight of the evidence, that finding should not be disturbed by the appellate court. And the second aspect of this issue of who is is Mr. Poole relying on for for payment of these bills has to be considered in context. Because the patient didn't come into Multicare and say, I want you to bill UnitedHealthcare. Instead, the patient came to Multicare, and I'm referring the court to the intake form, which was admitted as evidence in. Exhibit eight. And there, this is the first thing that Mr. Poole presents when he when he shows up for treatment. He says, who are the potentially responsible insurance carriers? He lists State Farm, his own auto carrier, and AAA Insurance Company, and says responsible for this occurrence. So this is not. Did he list UnitedHealthcare? No, he didn't list UnitedHealthcare. He only listed the two automobile carriers that were involved. And when when I cross examine the patient, he had to concede that he never told Multicare only billed my my health insurance carrier. He said he expected the total amount of Multicare's charges to be paid by one or more of either of these two insurance carriers, AAA or UnitedHealthcare. So the evidence on this issue supports the trial court's finding. That finding should not be disturbed because it is not against the manifest way of the evidence. I want to talk a little bit about. Oh, and Mr. Dar also said something about Multicare's owner having testified on this issue. But what Mr. Dar fails to tell the court is that testimony. And I don't I certainly don't confirm that that's what the testimony was. But that testimony was by pretrial discovery deposition. It was never offered in evidence by Mr. Dar in this case. And I suspect the reason why it was never offered in evidence because it doesn't support what he claims that he was attempting to show by this testimony. Let me talk about the so-called tortious interference theory. This is unusual, to say the least. Tortious interference is not a defense. It is an affirmative cause of action. Now, I don't know how it could apply in this case because there was no counterclaim for tortious interference, number one. Number two, tortious interference was never pledged as an affirmative defense because it isn't an affirmative defense. And finally, and perhaps most importantly, the sole support for this theory offered by Mr. Dar is a Wisconsin case that has nothing to do with the facts in this case. Let me talk briefly about this Wisconsin case. There, there was a contract between the patient's health care plan and the health care provider that provided that the health care provider must take certain discounts. So the court was simply enforcing the provisions of a contract, a contract that does not exist in this case. The second thing that the court relied on in this Wisconsin case is a statute enforced in Wisconsin that says that if a provider has a contract with the patient's health insurance carrier, the provider can only claim what is available under the health care provider's contract with the patient's health care plan. Well, there's no such statute in effect in Illinois, and of course there was no agreement between MultiCare and this patient's provider. Now, Mr. Dar refers to a statute that applies to hospitals. There is a statute in Illinois that says if a hospital has a contract with the patient's health care provider, or with the patient's health care insurance company, and that contract provides that the hospital must accept discounts, then by law, the legislature has said a part of the term of that contract means that the health care provider cannot bill the patient for the balance. Of course, that doesn't apply to a physician service such as MultiCare. We are not a hospital. It's undisputed that we are not a hospital. Furthermore, the statute would apply only if there were a contract between the provider and the patient's health care plan. So that isn't applicable here either. So we have a general law of Illinois, and that's cited in the Caban case, which the trial court relied on, that says the health care provider is free to bill 100% of his charges as long as the health care provider is not bound by some third-party contract with the patient's health insurance carrier that prevents him from doing so. And of course, if a PPO plan is in place, they all prohibit balance billing. Do you agree with that? Well, I think that's probably true, but I don't know. I say all, but... And one of the reasons I don't know is because the patient in this case never bothered to produce his health insurance plan. And in fact, it was demanded in discovery. For whatever reason, he chose not to produce it. To this day, I don't know, and there is nothing in this record that would show me what is in this man's health insurance plan. Let me turn briefly to this conversion issue. You asked, Justice Stewart, whether there's evidence in the record regarding actual knowledge on the part of the patient's lawyer as to the existence of this lien prior to disbursement of the proceeds. And the answer is unequivocally yes. The testimony of the lawyer is cited in pages 20 and 21 of our brief. He admits in spades that he has actual knowledge of the existence of MultiCare's health care lien when he was negotiating the settlement with AAA. Yet, in order to get AAA to pay the proceeds, notwithstanding that lien, this lawyer represented, misrepresented, on behalf of the patient, that all liens had been resolved. Now, this is not a case where an ignorant defendant is paying money out without notice or knowledge of the lien. AAA was properly served with this lien notice. It had actual knowledge. Admits it. The lawyer representing the patient had actual knowledge of the lien notice. That knowledge existed before AAA paid out the money and while the patient's lawyer retained and then paid out the money to the patient. These payments were made in direct derogation of the lien. Indeed, they were in direct violation of applicable law because the lien act says that where there is a lien, the payor must remit payment directly to the health care provider to the extent necessary to discharge the lien. That was completely ignored in this case. Two brief questions on this summary judgment order that is not mentioned in the notice of appeal. The applicable Supreme Court rule, I believe it's rule 302, mandates that as a condition to appeal an order, it has to be specified in the notice of appeal. And the notice of appeal has to contain a prayer for relief indicating that relief is sought from that particular order. Now, in this case, the summary judgment order was entered about two years before the final judgment. The notice of appeal does not make any mention of this prior summary judgment order. And there's nothing in the notice of appeal requesting relief from that order. Supreme Court precedent is consistent and clear that absent that identification in the notice of appeal, the appellate court lacks jurisdiction to grant relief from the order. But even if the court had jurisdiction, Your Honors, there is nothing on the merits that would warrant reversal. The only damages that the patient claims that he is suffering is the fact that the trial court entered a valid judgment against him for money that he lawfully owed to my client. If, as the trial court determined, this was a lawful indebtedness, then Mr. Poole has suffered no damages on account of his having to pay it. Let me turn briefly to the cross appeal. The cross appeal deals primarily with two errors of law committed by the trial court in quantifying multi-cares damages. And I use the word errors of law advisedly because these are not issues that turn on any factual point that was in dispute in the trial court. The first is the so-called common fund doctrine. The court assessed our damages, which were liquidated at approximately $15,000, and then says, I'm going to reduce them by one-third because the patient had to pay his lawyer one-third in order to prosecute and settle his claim against AAAs insured. Well, that common fund deduction was wrong for two reasons. Either of these reasons are sufficient to reverse. It does not apply because the amount owed to the health care provider is a debt. It's just the same thing as if the patient had gone out and charged the money on a credit card. When the credit card company has to be paid, the patient can't say, oh, well, I had to spend money on a lawyer to collect money to satisfy my bill, so you're going to have to be responsible for part of my legal fees. That's not the way it works. That's what the Supreme Court said, and that's exactly the case we have here. He incurred a debt that was not in any way contingent upon the settlement of his personal injury claim. He could have not recovered a penny on this claim. He would still owe the money to multi-payer. We didn't treat him on some contingent fee basis. In fact, that would be illegal to do so. Thank you, Your Honor. Rebound. In the court's order of July 31st, it makes a specific finding that balance billing, the unlimited by multi-care specials, that the HMO acts limitations on balance billing does not apply to multi-care. And the above health care providers, based on the argument that multi-care is shown to be part of doing the billing, lacks merit. So if the court found that they can't balance bill because of the HMO Act, the HMO Act makes it clear. If the court's finding that the HMO Act is applicable to multi-care, which it appears to do, the bottom paragraph of the top order, the HMO Act is abundantly clear that they cannot charge anything other than co-pays and deductibles. So in this case, we have the contract. The testimony was that it was produced in discovery as the billing, and when questioned at trial, they testified that they charged all of this, that all their charges were multi-care, regardless of who the provider is, under one tax ID number, and that's the right to reimbursement. That's cited in our appeal to that portion of the record. So we know that they're getting reimbursement, and there's a contract that allows them to get reimbursement at a discounted rate. Otherwise, it would just be arbitrary by UnitedHealthcare as what they were going to pay. So if that contract exists, then the prohibitions on balance billing have to exist also. And Mr. Antonelli made mention to the fact that the UnitedHealthcare contract wasn't admitted into evidence. I think it's really irrelevant to what the terms of his health care insurance was. There's no dispute that this was covered care. I don't think anyone's ever argued in this case that had we submitted it, it would not have been paid. The contrary fact is undisputed. They did submit charges for that type of care, and it was reimbursed at a discounted rate. And then whether or not on our consumer fraud claim, Mr. Antonelli addressed the fact that we only had judgment damages, or only damages that we could allege. Well, those damages would not exist had this scheme not existed. Had they not created this policy, and the court found that it was those who created the policy, then my client would have been able to have all those charges paid except for co-pays and deductibles. So, but for an unlawful scheme, which would be a factual matter to be tried by the trier of fact, if they find that it was an unlawful and fraudulent scheme, they could very well find the damages and assess supporting them. So I think that issue needs to be addressed. And I know that there's an issue with the notice of appeal. But I think since it was only the – I think this court should have jurisdiction to exercise that. As far as the reduction of the lien, I believe what the trial court was fashioning was since they did elect not to exercise the use of his health insurance, since they essentially took a stake in his lawsuit, that they were obligated to assert the common fund doctrine for the work that was performed on their behalf to recover the money. That's all I have on the issue. Thank you, counsel. We'll take this as a case under advisement. We're going to take a short recess before continuing with the next case. All rise.